## INTERNATIONAL RY. CO. v. PRENDERGAST et al.

District Court, W. D. New York.
May 22, 1930.

Henry W. Killeen, of Buffalo, N. Y., Coleman J. Joyce, of Philadelphia, Pa., James C. Sweeney, of Buffalo, N. Y., and Clarence R. Runals, of Niagara Falls, N. Y., for plaintiff.

Charles L. Feldman, Corporation Counsel, of Buffalo, N. Y. (Frederic C. Rupp, Jeremiah J. Hurley, and Fred C. Maloney, all of Buffalo, N. Y., and Frank C. Loughlin, of New York City, of counsel), for defendant City of Buffalo.

Charles G. Blakeslee, of Albany, N. Y. (Russell B. Burnside, of Albany, N. Y., of counsel), for defendant Public Service Commission.

George W. Knox, Corporation Counsel, of Niagara Falls, N. Y., for defendant City of Niagara Falls.

Before MANTON, Circuit Judge, and HAZEL and ADLER, District Judges, constituting a statutory court, convened pursuant to section 266 of the Judicial Code, as amended (28 USCA § 380).

MANTON, Circuit Judge.

This bill, in equity, seeks to enjoin an enforcement of state statutes and orders of the public service commission of the state of New York, requiring the plaintiff to operate its street railway at certain maximum rates of fare. The basis of the right to relief is that the rates of fare are inadequate, and, if enforced, would be confiscatory of

the plaintiff's property. Plaintiff filed a tariff fixing fares, and the public service commission refused, by the orders in question, to permit them to become effective. Its position is that the rate of return upon the fares now fixed is fair.

The plaintiff operates a system of railways on the streets of Buffalo; also interurban lines running from Buffalo to Niagara Falls; from Buffalo to Lockport, passing through the villages of Tonawanda and North Tonawanda; from Lockport to the village of Olcott; from Lockport to the villages of Depew and Lancaster. It has local lines in Niagara Falls and in Lockport. It owns and operates two bridges over the Niagara river and a railway line in Victoria Park and Niagara Falls, Ontario, Canada. In all it has 415 miles of track, about 250 miles of which are in the public streets and highways, and the balance private right of way. The public service commission is a state body, created by statute, with authority to regulate street railway fares.

After the present suit was started, the commission allowed to go into effect tariff schedules for the plaintiff's interurban lines, the Lockport lines, and the Lockport Olcott lines, and the village of La Salle merged with the city of Niagara Falls. The municipalities which now contest the plaintiff's claims are the city of Buffalo and the village of Lancaster.

The city of Niagara Falls has agreed with plaintiff for a stipulated fare subject to approval by the commission, and moves to dismiss the suit as against it. This motion will be denied for the present and may be renewed if the public service commission approves the rate of fare stipulated to be charged in that city.

In January, 1892, the city of Buffalo, representing its inhabitants, entered into the so-called Milburn agreement (see chapter 151, Laws of 1892) with the Buffalo Railway Company, West Side Street Railway Company, and the Crosstown Street Railway Company, all owning and operating railway lines in the city of Buffalo. The purpose of this agreement was to establish free transfers for passengers from one line to another throughout the city; a uniform transportation charge of 5 cents; to abolish charges for transfers; to relieve the West Side Street Railway Company and the Crosstown Street Railway Company from the obligation to pay a percentage of its gross annual receipts to the city of Buffalo and to substitute for the then existing statutory contract obligation therein specified percentages of the gross receipts to be paid annually to the city. It has been held by the Court of Appeals of the state of New York that this agreement was made for a sufficient consideration and bound both parties, and that, pursuant to the tenth paragraph of that agreement, the public service commission had authority to regulate the fares to be charged in the city of Buffalo. International Railway Co. v. P. S. C., 226 N. Y. 474, 124 N. E. 123. The plaintiff succeeded to the ownership of the railway lines referred to in the Milburn agreement.

On two occasions prior to the commencement of this suit, the public service commission conducted rate hearings and fixed a rate of fare to be charged in the city of Buffalo. On each occasion it was based upon the valuation of the plaintiff's property, used and useful, in rendering service in the city, as the base rate, having regard for the operating expenses and income in the city of Buffalo only. Following the practice prevailing with the public service commission, plaintiff has kept its books on the basis of segregating the operating expenses, income, and invested capital in the city of Buffalo from the rest of its property used in other cities and villages, and it has made its reports to the public service commission accordingly. Before doing this, however, the plaintiff resisted such segregation, and it was only under compulsion that it filed its reports with the commission in such form. In the amended and supplemented bill filed, the plaintiff contends that it is entitled to a return upon the unified system, and that it is improper for it to be required to segregate its lines used in each city and village to fix a fare based upon a fair return on the properties so used in each city or village. But on this application for temporary relief, it is contented to rest on such segregation.

The last determination of the public service commission permitted the plaintiff to file a tariff providing for a charge of a 10 cents fare for a single ride, but all passengers may purchase three tokens for a quarter. On this application for temporary relief, plaintiff asks that it be permitted to charge a straight 10 cents fare and eliminate three tokens for a quarter from the tariff. It has filed its tariff accordingly, and the sole question on this motion is whether it should be granted such relief pending the termination of this suit and whether it should receive as temporary relief an increased fare of 8 cents in the village of Lancaster. The present suit

was instituted prior to the permission granted by the commission to charge a 10 cents fare with three tokens for a quarter in Buffalo. Permission to file such tariff was granted after an acceptance in writing was filed with the commission June 25, 1927, which among other things, provided: "In view of the belief of the company that the maximum fares chargeable under such tariff and order will not produce sufficient revenue, and that, to the extent of the deficit below a fair return, said rates will be confiscatory. International Railway Company expressly reserves the right hereafter to allege and prove the insufficiency of said rates, before this Commission, before any other public authority, and before any court of competent jurisdiction, and to ask and receive on account thereof, such relief as it may be entitled to have according to law."

When this suit was started, there was in effect an order of the commission of February 26, 1925, fixing the rate upon the plaintiff's lines in the city of Buffalo at 8 cents with two tokens for 15 cents. On September 16, 1926, the plaintiff filed with the commission an application for leave to file a new tariff specifying increased rates of fare in the city of Buffalo. The commission refused to allow such new rates to be effective, but proceeded with the hearing and allowed the rates now challenged. It fixed a rate base for Buffalo of $23,261,500. This it is said to have fixed without regard to reproduction cost new less actual depreciation and based upon book costs as the dominating element. This action was started November 5, 1926, a month after the commission had rejected the proposed new tariff for lines in Buffalo. The proceedings fixing the present tariff to be charged resulted in a suspension of the trial until the railway company could experiment in operating under such fares for a reasonable time (reserving to it, however, its right to proceed, as per the stipulation in its acceptance) and ascertain whether or not the rates of fare allowable were confiscatory of its property.

■■ The plaintiff may maintain this suit in this court on the claim of confiscation of its property without resorting to certiorari proceedings in the state court under the statute. It need not submit to a continual confiscation of its property. Smith v. Illinois Bell Tel. Co. (1926) 270 U. S. 587, 46 S. Ct. 408, 70 L. Ed. 747; Banton v. Belt Line Ry. (1925) 268 U. S. 413, 45 S. Ct. 534, 69 L. Ed. 1020; United States v. Abilene & So. Ry. (1924) 265 U. S. 274, 44 S. Ct. 565, 68 L. Ed. 1016; Prendergast v. N. Y. Tel. Co. (1923) 262 U. S. 43, 43 S. Ct. 466, 67 L. Ed. 853; Oklahoma Natural Gas Co. v. Russell (1923) 261 U. S. 290, 43 S. Ct. 353, 67 L. Ed. 659. Plaintiff claims, in the amended bill, that after a fair trial the present rate of fare does not yield a fair return and it suffers confiscation of its property daily. It was not incumbent upon the plaintiff to petition for rehearing before the commission, nor was it required to resort to another method of relief before continuing its suit properly and timely instituted, and which it held in abeyance pending the trial method. Prendergast v. N. Y. Tel. Co. supra.

■■ At the time of the commencement of the present action, its tariff had been rejected by the commission. This was a final legislative act which compelled the plaintiff to operate at the then existing and claimed confiscatory rates pending the proposed investigation by the commission, and restrained the plaintiff from charging the rates specified in its proposed tariff, which it claims are the minimum just and reasonable rates which it might charge on its lines, amounting, if established, to compulsion to operate on the confiscatory rates. If such rates are confiscatory, it requires the plaintiff to operate in violation of its rights under the Constitution, and it entitles the plaintiff to seek relief here. The fact that the commission proceeded with its investigation and thereafter fixed rates which, after a trial, are claimed to be confiscatory, does not remit the matter to the legislative state. The order fixing the new confiscatory rates has placed the subject-matter, subject to review by judicial action, and justified the filing of the supplementary bill. Prendergast v. N. Y. Tel. Co., supra; St. Louis & San Francisco R. v. Hadley (1907) 155 F. 220 (C. C. Mo.). Nor is there substance in the claim that the plaintiff abandoned this suit or agreed to the fare last fixed by the commission. The reservation in the stipulation of acceptance is a sufficient answer. See, also, Banton v. Belt Line Ry. Co., supra.

■■ While the plaintiff and the city of Niagara Falls have stipulated an 8 cents fare in the city of Niagara Falls, if this be not approved and therefore the tariff of 8 cents disallowed by the commission, it becomes necessary to determine whether the Legislature has contracted away its power of regulation over these two municipalities. The plaintiff is now bound by the contract to operate at 5 cents. Franchises granted by Niagara Falls contain rate provisions and

are granted for 99 years. A city has the power, under the law, to make a contract suspending the police power of the state over a rate of fare. The contract is binding for the term of the contract, but that the Supreme Court has held that such contract may be made only for a reasonable period of time. R. R. Comm. v. Los Angeles Ry. Corp. (1929) 280 U. S. 145, 50 S. Ct. 71, 74 L. Ed. 234; Columbus Ry. Co. v. City of Columbus (1919) 249 U. S. 399, 39 S. Ct. 349, 63 L. Ed. 669, 6 A. L. R. 1648; New Orleans Gas Co. v. Louisiana Light Co. (1885) 115 U. S. 650, 6 S. Ct. 252, 29 L. Ed. 516. When the franchises were granted in both Niagara Falls and Lancaster, the railroad law of the state (No. 181) fixed a maximum fare between points within a city or village at 5 cents. It provided that when franchises were granted (No. 172), all municipal consents of street railway operation must be granted upon the express condition that all the provisions of railway law with respect to street railroads pertinent to the consent should be complied with. These franchises for 99 years, and in perpetuity, cannot be considered as intended to be contracts suspending the police power of the state. Franchise provisions as to rates of fares are legislative rates when fixed and made by municipalities under a sovereign power delegated to them and are binding. Matter of Quinby v. P. S. C. (1918) 223 N. Y. 244, 119 N. E. 433, 3 A. L. R. 685. This is upon the theory that such delegation to municipalities clothes them with a sovereign power with respect to such street railroad rates. If the rates provided for in Niagara Falls and Lancaster franchises are rates fixed by the municipalities in the exercise of their sovereign power, they are compulsory rates and as such are confiscatory, if inadequate. But the state Court of Appeals has held that municipalities of a state have no power to make a contract suspending the police power of the state over rates and fares, and no power to fix the rate and fare beyond the exercise of the police power of the Legislature. The Legislature has plenary power to regulate likewise, notwithstanding fare provisions contained in any municipal consent. Village of Brownville v. P. S. C. (1924) 209 App. Div. 640, 205 N. Y. S. 525, affirmed 240 N. Y. 587, 148 N. E. 716. The public service commission has power to regulate all such specified rates where municipalities have granted franchises since the first Public Service Commission law became effective in 1907. People ex rel. Garrison v. Nix-on (1920) 229 N. Y. 575, 128 N. E. 255; People ex rel. City of New York v. Nixon (1920) 229 N. Y. 356, 128 N. E. 245. Since the Legislature has the power to regulate rates specified in the municipal consents, no municipality has the power to make a contract whereby the police power of the state is suspended. The rate of fares in Niagara Falls and Lancaster are not contract rates at which the plaintiff has agreed to operate for a period of 99 years, during which time the police power of the state is suspended. They are statutory rates fixed by the railroad law over which the commission has no jurisdiction because the Legislature had not delegated that to the commission. Matter of City of Niagara Falls v. P. S. C. (1920) 229 N. Y. 333, 128 N. E. 247.

In support of the application for this relief, the plaintiff has submitted affidavits and tabulations showing its claimed present fair value of the property, used and useful, in its street railway system and devoted to such public service. The defendants have answered by equally voluminous affidavits. There is no basis upon which these respective contentions may be reconciled. The plaintiff's claim is that its property in its unified system has a present fair value of $91,229,043; that a proper allocation of this to the city of Buffalo is $60,290,131, from which a depreciation should be deducted of $5,000,000, leaving a present value of $55,000,000; Niagara Falls, fair value of $5,068,000, with a deduction of depreciation of $1,780,000, leaving a present value of $5,065,000; Lancaster, present fair value of $363,000, with a deduction for depreciation of $12,000, leaving a present value of $350,000. The return on the system for 1926 was $1,506,000; for 1927, $1,522,000; for 1928, $2,029,000; and, for 1929, $1,981,000. In Buffalo, there was a return of $1,544,000 for 1928 and $1,436,000 for 1929. There was a deficit in Niagara Falls and Lancaster in each of these years. The affidavits in opposition fix the present value of the plaintiff's plant and property, used and useful, in the street railway service in the city of Buffalo at $18,788,884; the public service commission (without depreciation) at $20,094,254. The city of Buffalo estimates the earnings for 1928 at $2,093,905; for 1929 at $2,786,617. The operating expenses claimed by the plaintiff are seriously disputed by both the city and the public service commission, which would to some extent explain the difference of opinion as to earnings during these years. It is also claimed by the city that miles of

track have been abandoned by the plaintiff; that it has considered such trackage in arriving at its valuation; that many cars not used have depreciated so as to have no value, but have been estimated by the plaintiff in its valuation. The amounts allowed by the plaintiff for depreciation have also been attacked. This contrariety of opinions and disputes as to appraisals and the method followed in arriving at such appraisals are matters which cannot be decided upon affidavits. The facts may only be ascertained after an opportunity of examination and cross-examination by the parties. Preliminary injunctive relief against the operation of rates promulgated by the state regulatory bodies are granted only when it is clearly demonstrated that the rates in their effect are confiscatory of the utility's property. Gilchrist v. Interborough Co. (1929) 279 U. S. 159, 49 S. Ct. 282, 73 L. Ed. 652; United Gas Co. v. R. R. Com. (1929) 278 U. S. 300, 49 S. Ct. 150, 73 L. Ed. 390; Galveston Electric Co. v. Galveston (1922) 258 U. S. 388, 42 S. Ct. 351, 66 L. Ed. 678; Willcox v. Consolidated Gas Co. (1909) 212 U. S. 19, 29 S. Ct. 192, 53 L. Ed. 382, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034.

On the other hand, the plaintiff is entitled to a fair return on capital invested in its property devoted to public service, even though it be recognized that the street railway companies have been injuriously affected by the bus system of carriage and the more frequent use of automobiles. United Railways & Electric Co. v. West (1930) 280 U. S. 234, 50 S. Ct. 123, 74 L. Ed. 390. It is not practical to fully protect the rights of the public in the event that an increase be presently allowed and ultimately found erroneous, and therefore a bond given by the railroad company to return the excess fare in the event that it is found the present rate of fare is nonconfiscatory would not suffice. City of Louisville v. Louisville Home Tel. Co. (1922) 279 F. 949 (C. C. A. 6); Ann Arbor R. Co. v. Fellows (1916) 236 F. 387 (D. C. Mich.).

In view of this sharp contradiction as to valuations, operating expenses, and earnings, the temporary relief asked for will be denied. A master will be appointed, who will give assurance of prompt disposition of the issues raised by the parties by sitting continuously in hearing the testimony and the respective contentions. It will be a more just guide to ascertain the correctness of the plaintiff's claim of confiscation.

Motion denied.