In the Matter of the Application of the VILLAGE OF MAMARONECK, Appellant, for a Prohibition Order against THE PUBLIC SERVICE COMMISSION OF THE STATE OF NEW YORK and Another, Respondents.

Third Department, March 5, 1924.

Public Service Commission — authority granted by Laws of 1921, chapters 134 and 335, amending Public Service Commission Law, § 49, subd. 1, to modify rates of street railway company provided in franchise with municipality was taken away by Laws of 1923, chapter 891 — such authority d'd not continue for purpose of granting application made prior to June 1, 1923, on which date Laws of 1923, chapter 891, took effect — prohibition order granted restraining Public Service Commission from approving tariff schedule between points outside village of Mamaroneck in excess of those provided in franchise agreement — proposed increase resulted from increase within nearby village of Larchmont consented to by said village.

The authority delegated to the Public Service Commission by chapters 134 and 335 of the Laws of 1921, amending subdivision 1 of section 49 of the Public Service Commission Law, to modify the rates of fare of a street railway company provided in its franchise with a municipality, was taken away by chapter 891 of the Laws of 1923, which took effect on June 1, 1923, amending subdivision 1 of section 49, and such authority did not continue for the purpose of granting an application for the approval of a tariff schedule filed with the Public Service Commission prior to June 1, 1923, but upon which no formal action was ever taken because further proceedings were stayed on an application for an order of prohibition.

Accordingly, the village of Mamaroneck was entitled, after June 1, 1923, to a prohibition order restraining the Public Service Commission from approving a tariff schedule filed by the New York and Stamford Railway Company prior to June 1, 1923, providing for a fare in excess of five cents between points outside said village in violation of a franchise agreement made on July 19, 1899, between said village and a predecessor of said company, although the application for said order was heard and denied by the Special Term prior to June 1, 1923, and although the proposed increase in fares complained of was the result of a proposed increase within the nearby village of Larchmont through which the tracks of the company extend, which increase was consented to by the village of Larchmont.

HINMAN, J., dissents, with opinion.

APPEAL by the petitioner, the Village of Mamaroneck, from an order of the Supreme Court, made at the Rensselaer Special Term on the 28th day of April, 1923, as resettled by an order entered in the office of the clerk of the county of Albany on the 21st day of May, 1923, denying petitioner's application for a prohibition order to restrain the Public Service Commission from approving the tariff schedule filed by the New York and Stamford Railway Company.

*J. Henry Esser,* for the appellant.

*Charles G. Blakeslee [Russell B. Burnside* of counsel], for the respondent.

*Graham, McMahon, Buell & Knox [Ralph P. Buell* of counsel], for the respondent New York and Stamford Railway Company.

*George P. Nicholson, Corporation Counsel of the City of New York [Joseph A. Devery* of counsel], *amicus curiæ.*

*Clarence DeWitt Rogers,* for the Village of Larchmont.

McCANN, J.:

The defendant, respondent, the New York and Stamford Railway Company, is a domestic corporation organized under the Railroad Law of this State as a consolidation of the Larchmont Horse Railway Company and the Port Chester Street Railway Company. It operates a street surface railway from a point in the city of New Rochelle through the towns of Mamaroneck, Harrison and Rye, and the villages of Larchmont, Mamaroneck, Rye and Port Chester, all located in the county of Westchester, and also through the town, village and borough of Greenwich to a terminus in the city of Stamford, all in the State of Connecticut. Its total mileage including the main line and branches is twenty-six and thirty-seven one-hundredths miles. An order was made on July 22, 1920, which permitted the company to divide its line into zones for the purpose of establishing zones of fare. Such order provides for a five-cent fare in the village of Mamaroneck and also a five-cent fare in the village of Larchmont but requires the payment of a fare in excess of five cents from without the village of Mamaroneck to points within that village and *vice versa.* It is conceded that the fares charged by the company pursuant to this order are in excess of that named in the franchises by which the village of Mamaroneck permitted the building and operation of the street railway through its streets. The street railway company has presented a petition to the Public Service Commission asking leave to issue on a three days' notice a tariff schedule which will increase the rate of fare in the village of Larchmont, the latter village having

**332** MATTER OF VILLAGE OF MAMARONECK *v.* PUB. SERV. COMM.

Third Department, March, 1924.                    [Vol. 208

previously duly consented to such increase.  Hearings have been held before the Public Service Commission and the village of Mamaroneck has appeared and opposed the granting of such relief and claims that the provisions of its franchise with the street railway company which restricts the rate of fare to be charged ousted the Public Service Commission of jurisdiction to entertain the proceeding of enforcing the rates as contemplated.  The village applied for an order of prohibition which was denied, and from the order of the Special Term denying the same, the appeal is now taken to this court.  The franchise agreement urged by the village of Mamaroneck was made on July 19, 1899, with the Larchmont Horse Railway Company and the 13th paragraph thereof reads as follows:  " Said Railway Company shall not charge more than a single fare of five cents for each passenger for one continuous ride in either direction between its terminus in the Village of New Rochelle and its terminus in the Village of Harrison; and upon any other route or line of railway operated by it in the Towns of Mamaroneck and Harrison."

The company is charging a single fare of five cents per passenger between the points entirely within the village of Mamaroneck but is charging single fares in excess of five cents between the points mentioned in the above section of the franchise agreement which are outside of the village of Mamaroneck.  The main question at issue on this appeal is this — does the agreement between the village of Mamaroneck and the company's predecessor in respect to rates for transportation outside of the limits of that village, deprive the Public Service Commission of jurisdiction to regulate such rates outside the village?

The merits of the application are in no way involved on this appeal.  In discussing the rights of the parties and the decisions of the courts bearing on the same, it is well to bear in mind that the Public Service Commissions Law, being chapter 480 of the Laws of 1910 (Consol. Laws, chap. 48), as amended by chapter 546 of the Laws of 1911, reads as follows:

" § 49.  Rates and service to be fixed by the Commission.

" 1.  Whenever either Commission shall be of opinion, after a hearing had upon its own motion or upon a complaint, that the rates, fares or charges demanded, exacted, charged or collected by any common carrier, railroad corporation or street railroad corporation subject to its jurisdiction for the transportation of persons or property within the State, or that the regulations or practices of such common carrier, railroad corporation or street railroad corporation affecting such rates are unjust, unreasonable, unjustly discriminatory or unduly preferential, or in anywise in violation of any

provision of law, or that the maximum rates, fares or charges, chargeable by any such common carrier, railroad or street railroad corporation are insufficient to yield reasonable compensation for the service rendered, and are unjust and unreasonable, the Commission shall with due regard among other things to a reasonable average return upon the value of the property actually used in the public service and to the necessity of making reservation out of income for surplus and contingencies, determine the just and reasonable rates, fares and charges to be thereafter observed and in force as the maximum to be charged for the service to be performed, notwithstanding that a higher rate, fare or charge has been heretofore authorized by statute, and shall fix the same by order to be served upon all common carriers, railroad corporations or street railroad corporations by whom such rates, fares and charges are thereafter to be observed."

The short title of the statute was changed to Public Service Commission Law by chapter 134 of the Laws of 1921, and the foregoing quotation was amended by chapters 134 and 335 of the Laws of 1921, by inserting therein, among other provisions, a provision authorizing the regulation of fares " notwithstanding that a higher or lower rate, fare or charge has been heretofore prescribed by general or special statute, contract, grant, franchise condition, consent or other agreement."*

The law continued as above quoted until the passage of chapter 891 of the Laws of 1923, which became effective on June first of that year, by which law the amendments of 1921 to the foregoing quotation were repealed and the law made to read substantially as it was before the enactment of the laws of 1921, above cited.   Therefore, in construing the various decisions it is necessary to bear in mind that the law prior to 1921 and the law subsequent to June 1, 1923, are the same and that the law of 1921 until June 1, 1923, contained the above quoted clause.

We are confronted upon this appeal with the following questions:

(1) Is the order of prohibition the proper procedure in this case? This question was expressly waived upon the argument and, therefore, needs no further discussion.

(2) Is the law of 1921, or the amendment of 1923, controlling in this case?

(3) What are the powers of the Public Service Commission under the respective laws?

The petition of the street railway company for increase of fares was filed with the Public Service Commission previous to the

---

* See. also, Laws of 1922, chap. 153, amdg. said § 49, subd. 1.— [REP.

**334** MATTER OF VILLAGE OF MAMARONECK *v.* PUB. SERV. COMM.

Third Department, March, 1924. [Vol. 208

enactment of chapter 891 of the Laws of 1923. A hearing was held but no formal action was ever taken because further proceedings were stayed by the order of prohibition. The village of Mamaroneck insists that the law which became effective on June 1, 1923, controls and the street railway company insists that the law of 1921 controls in defining the powers of the Public Service Commission.

*Matter of Quinby* v. *Pub. Serv. Comm.* (223 N. Y. 244) is a case which arose in the city of Rochester. The petition was made by a street railway company for permission to increase its fares in that city. A writ of prohibition was secured by the city. Objections were raised to the jurisdiction of the Public Service Commission to entertain such application on the grounds: *First*, on section 7 of chapter 359 of the Laws of 1915, amending section 636 of the Charter of the City of Rochester * and fixing a five-cent rate for one ride over the road of any corporation operating a street surface railroad in such city; and, *second*, upon the like terms and conditions contained in the franchise of the street railroad company as a condition of the consent of the local authorities thereto.

Section 18 of article 3 of the State Constitution reads as follows: " But no law shall authorize the construction or operation of a street railroad except upon the condition that the consent of the owners of one-half in value of the property bounded on, and the consent also of the local authorities having the control of, that portion of a street or highway upon which it is proposed to construct or operate such railroad be first obtained   *   *   *."

It was said that " in the absence of clear and definite language conferring without ambiguity jurisdiction upon the Public Service Commission to increase rates of fare agreed upon by the street railroad and the local authorities we should not unnecessarily hold that the Legislature has intended to delegate any of its powers in the matter, whatever its powers may be." The question as to whether the Legislature had any authority and if so the extent thereof was expressly reserved in the following language: " It is, however, unnecessary and, therefore, improper to decide at this time what the limits of legislative power are in this connection."

Therefore, in so far as the *Quinby* case is applicable to the one at bar it holds that under the law in effect prior to 1921 the Public Service Commission has no authority to modify or interfere in any way with a local contract which is made a condition of a franchise granted by a municipality to a street car company for permission

---

* See Laws of 1907, chap. 755.— [REP.

to construct or operate its railway within the municipal limits. That case has been much cited, distinguished and explained. It is our belief that the argument therein contained while in that case it affects only urban rates is just as applicable to interurban rates. It has been shown above that the law of 1921 inserted a provision authorizing the Public Service Commission to regulate fares notwithstanding local contracts. It has also been shown that the law of 1923 repealed the provision inserted in 1921; therefore, the statutory law to-day is the same as it was at the time of the *Quinby* case; hence if the law of 1923 controls in the decision of this case, the *Quinby* case is binding upon us. It is well to review briefly some of the many cases which have been decided since the *Quinby* case. *Matter of City of Niagara Falls* v. *Pub. Serv. Comm.* (229 N. Y. 336) is a case where a street railway applied to the common council of the city of Niagara Falls for consent to construct and operate its cars upon public highways. The city applied for a writ of prohibition, as in the case at bar, asking that the Public Service Commission be restrained from assuming and exercising jurisdiction. It was held that *Matter of Quinby* was controlling; it also referred to the fact that in 227 New York, 601, on motion for reargument, the decision in the *Quinby* case was reiterated. The court says: " We are now urged to hold that the Legislature intended to delegate power to the Public Service Commission to modify the rates prescribed in the contract between the local authorities and the railroad company, against the protest of the municipality, notwithstanding the refusal of three successive legislative bodies to accede to such demand for delegation of power. This we are not prepared to accede to."

That decision was made prior to the amendment of the then named Public Service Commissions Law in 1921. McLAUGHLIN, J., wrote a dissenting opinion in this case in which he holds that " The State may increase or diminish a rate fixed in a franchise or contract " and that the Legislature has constitutional power to modify such rates.

Following is his language: " Whatever power the State had in this respect was inherent, an attribute of sovereignty, of which it could not be deprived by the contracting parties any more than it could of its own existence."

In this view three of his associates concurred. It is interesting to note that in a separate opinion written by CARDOZO, J., he states that the only question involved in the *Quinby* case was one of statutory construction.

In *People ex rel. Village of South Glens Falls* v. *Pub. Serv. Comm.* (225 N. Y. 216) there was no constitutional question involved. It

**336** MATTER OF VILLAGE OF MAMARONECK *v.* PUB. SERV. COMM.

Third Department, March, 1924. [Vol. 208

arose over the granting of a franchise to use a public street for the laying of gas mains, a part consideration for such franchise being that the price of gas was to be limited. It was held that the Legislature had the power to regulate and that such power had properly been conferred upon the Public Service Commission. The contract in question was authorized by the Transportation Corporations Law which gave to gas companies the power to lay pipes with the consent of municipal authorities under such reasonable regulations as they might prescribe. It held that the rate regulation in that case was a police power and one which might be regulated without impairing the obligation of the contract.

The decision in the *Glens Falls* case is placed upon the ground that the Legislature by subdivision 5 of section 66 and by section 72 of the then named Public Service Commissions Law, which apply solely to gas and electricity, distinctly delegated the authority to the Public Service Commission to modify local contracts. This was not the situation in the *Quinby* case. That case also states that while the power of the Legislature to deal with such local contracts was specifically reserved in the *Quinby* case " the opinion [in the *Quinby* case] clearly intimated that such power did exist."

The constitutional provision regarding street railways not having been at issue in the *Glens Falls* case, there is nothing in such opinion which is in any way controlling in the case at bar.

*Matter of Koehn* v. *Pub. Serv. Comm.* (107 Misc. Rep. 151) is a case where a railroad (not a street railway) was built and operated on private property. It is said in that case that the constitutional provision with reference to consents for the construction or operation of street railways " was intended to confer upon the localities power to impose conditions, if at all, pertinent to the grant of such consents so far as the municipality had a city purpose to protect, not inconsistent with the public interests of the State at large."

It was also said, " assuming, therefore, that these municipalities had the power to fix rates of urban fare as a condition of the granting of consents to an urban railroad, did they have any authority, implied in this constitutional provision, to fix rates of interurban fare as a condition of the granting of consents to such an interurban line as is here in question? Does it serve a public purpose of the city to fix rates of fare to and from other municipalities? It is my opinion that the consideration asked by the city cannot be something which is not germane to the public purpose for which the city and its government exists and certainly not something which is contrary to the public policy of the State."

The discussion in that case is valuable as showing the reasons which are applicable to the case at bar. It states that " the fixing

of interurban rates of fare is normally a legislative function to be exercised in the interest of the general public, beyond the control of any city in the absence of clear warrant of authority therefor. It certainly was not intended to permit a city to invade the sovereignty of the State, where, as in the fixing of interurban rates, the rights of other municipalities and the inhabitants of the State generally are involved and where thus a State issue rather than a local concern is clearly indicated."

It is also said that " the Legislature has never meant to leave any such unusual power in any municipality under the sanction of the constitutional provision but has reserved full authority in itself for that purpose, and has given such power to its own agent, the Public Service Commission."

It was also pertinently stated: " Can the city of Tonawanda to-day fix a rate of fare by a condition in a consent which has effect outside its own boundaries and thus deprive the Public Service Commission of jurisdiction clearly given to it? That would be putting the railroad system of the State at the mercy of some of its cities, in a matter concerning not only the inhabitants of those cities, but all the inhabitants of the State."

The court in that case concludes by holding that this was not a case which was controlled by the constitutional provision and, therefore, the rule in the *Glens Falls* case rather than the *Quinby* case was applicable.

*Matter of Fleming* (117 Misc. Rep. 373) was a prohibition proceeding brought to restrain the increase of rates. The headnote states: " While a city although having no constitutional authority to prescribe the rate of fare may impose as a condition to the giving of its consent to the operation of a street railway within the corporate limits that a stipulated rate of fare shall be charged, the Legislature has full power to determine the conditions that local authorities may attach to railroad consents to be given in the future."

The rate which is fixed as a consideration for the contract is subject to regulation by the Legislature. The substance of the argument in that case, as applicable here, is that the city cannot prescribe a fare but can impose a condition of a stipulated fare; that the *Quinby* case dealt only with the powers of cities over corporations, in the absence of legislative control; and that no city can take away the regulatory or police power of the State, and the conclusion reached was that the local franchises were made with the implication that the Legislature had the right to regulate the fare and that the Commission had jurisdiction to grant the relief asked for so far as the local franchises within the city of Troy were concerned.

22

**338**  Matter of Village of Mamaroneck *v.* Pub. Serv. Comm.

Third Department, March, 1924.                    [Vol. 208

In connection with this, however, it must be remembered that in the *Fleming* case the court read into the contract the provisions of section 181 of the Railroad Law with reference to the control of rates of fares within the limits of a city.

*People ex rel. Garrison* v. *Nixon* (229 N. Y. 575) (1920) is a case which was decided upon the question of procedure, but the dissenting opinion of Crane, J., is instructive as a reiteration and exhaustive discussion of the right of the Legislature to override conditions imposed by local franchises. The opinion, in which two of the judges concur, says: " The power to regulate fares is one of the police powers of the State Legislature. * * *" and that " consents * * * given to all these railroads were subject to these laws and the power of the Legislature through the Public Service Commission to regulate the rate of fare."

*People ex rel. New York & N. S. T. Co.* v. *Pub. Serv. Comm.* (175 App. Div. 869) (1916), which is cited as conclusive against the appellant herein, was overruled by the *Quinby* case. The force of the opinion in *People ex rel. South Shore Traction Co.* v. *Willcox* (133 App. Div. 556) (1909), apparently favoring the appellant, is much modified by the holding on appeal (196 N. Y. 212) which is an affirmance but which refuses to hold to the extent of the opinion in the Appellate Division and expressly limits its effect to the matters there at issue.

In the case of *People ex rel. New York, W. & B. R. Co.* v. *Pub. Serv. Comm.* (193 App. Div. 454) (1920) the Appellate Division, First Department, recognizes the fact that the question now before us had not been settled when that decision was rendered. The following appears in the opinion: " With respect to such conditions imposed by the municipal authorities in the exercise of their right conferred by section 18 of article 3 of the State Constitution to grant or withhold the consent to the construction and operation of a street railroad for the construction of which the consent of the owners of one-half in value of the property bounded on the street or highway is also required, the power and authority of the Legislature *effectively* to increase the rate of fare without the consent of the municipal authorities so that there may be no forfeiture of the grant by the latter, has down to the present been left in doubt."

This court in the case of *People ex rel. Village of Brownville* v. *Pub. Serv. Comm.* (198 App. Div. 391) (1921) has held directly on the principal point at issue herein. The facts in that case and the instant case are quite analogous. In both cases there is a franchise defeasible in case of a non-compliance with the prescribed rates whether for urban or interurban service. The franchise in each case was made prior to the passage of section 49 of chapter

429 of the Laws of 1907. This case is not cited on any brief presented in this appeal, but it is the law of this court and holds that a contract such as that with the village of Mamaroneck is one " with the terms of which no interference by a Public Service Commission [is] permissible." The *Brownville* case was decided under the law as it existed prior to the amendment of 1921, as referred to. It is true that in the instant case the village of Larchmont is not litigating the change in its own franchise. It consents thereto. The change, however, affects directly the Mamaroneck franchise and establishes a discriminatory rate. The difference between the two cases, however, presents no different argument. In each case there is a contract between the village and the street railway company, and whether urban or interurban the Public Service Commission cannot interfere therewith. The statute applies to both cases, and the Mamaroneck franchise cannot be attacked indirectly through a modification of the Larchmont franchise any more than it can be attacked directly. Without rehearsing the various arguments and the dicta appearing in the cases above cited, and in other cases which might be referred to, we conclude that the Legislature has authority to regulate rates of fare which are prescribed by a contract which is a part of the consideration for the granting of the construction and operation of a street railway within or without a municipality under the provisions laid down in section 18 of article 3 of the State Constitution, and that such authority may be delegated to the Public Service Commission. We are also of the opinion that the Public Service Commission when properly authorized has such powers. If the Legislature desires to give the Public Service Commission the authority, which is claimed in this case, it is a simple matter to enact a law to that effect. It would have simplified matters if the Legislature had not repealed the law which granted those very powers. The Legislature passed the acts of 1921 and we are simply carrying out its intent as expressed in the act of 1923 in prohibiting the Public Service Commission from exercising the powers which had been given and subsequently taken away. It follows that the law prior to the acts of 1921 and the law subsequent to June 1, 1923, are the same under the rule and argument in the *Quinby* case, to wit, there can be no control by the Public Service Commission because of the fact that the law during those periods provided no specific and definite authority for the Public Service Commission to interfere with such contracts. However, the law of 1921 gave such specific authority and we hold that the Legislature had the authority to so delegate it.

We now come to another important question in this case — which law controls in this proceeding, the law of 1921 or the law of 1923?

**340** MATTER OF VILLAGE OF MAMARONECK *v.* PUB. SERV. COMM.

Third Department, March, 1924.                    [Vol. 208

Section 93 of the General Construction Law reads: " Effect of repealing statute upon existing rights. The repeal of a statute or part thereof shall not affect or impair any act done, offense committed or right accruing, accrued or acquired, or liability, penalty, forfeiture or punishment incurred prior to the time such repeal takes effect, but the same may be enjoyed, asserted, enforced, prosecuted or inflicted, as fully and to the same extent as if such repeal had not been effected."

Section 94 of the same law reads: " Effect of repealing statute upon pending actions and proceedings. Unless otherwise specially provided by law, all actions and proceedings, civil or criminal, commenced under or by virtue of any provision of a statute so repealed, and pending immediately prior to the taking effect of such repeal, may be prosecuted and defended to final effect in the same manner as they might if such provisions were not so repealed."

Those sections are cited as authority for holding that the powers of the Public Service Commission as in existence at the time of the filing of such petition are preserved for the purposes of this proceeding. We cannot concur in such conclusion. The Public Service Commission derived its authority from the Legislature. It was a delegated power to be exercised in behalf of such body. It was analogous to a revocable power of attorney, the authority under which had not been executed. Such power having been delegated, the Public Service Commission could act only while its authority continued. Had it acted its order would have been in effect the act of the Legislature. Its power having been revoked, its authority ceased at once. Sections 93 and 94 of the General Construction Law do not apply. There is no right affected as referred to in the former section neither is this an action or proceeding within the meaning of the latter section as such terms are defined by sections 11-a and 46-a of the General Construction Law (as added by Laws of 1920, chap. 917), which were revised from sections 3333 to 3335, inclusive, of the Code of Civil Procedure.

In conclusion we hold that the Public Service Commission has no authority in this case to modify the rates of fares provided in the franchise with the village of Mamaroneck but such authority while delegated to such Commission by chapters 134 and 335 of the Laws of 1921 was taken away by chapter 891 of the Laws of 1923 and that such authority did not continue for the purpose of granting the application now before this court.

The order appealed from should be reversed on the law, with costs, and the motion for an order of prohibition granted, without costs.

COCHRANE, P. J., concurs; H. T. KELLOGG and VAN KIRK, JJ., concur in result; HINMAN, J., dissents, with an opinion.

HINMAN, J. (dissenting):

I think there is a clear element of distinction between this case and the *Quinby* case and the other cases in the Court of Appeals which have followed the *Quinby* decision. In each of those cases there was involved the question of the rate of fare within the limits of the complaining municipality. Here we have the question of interference by an outside municipality with reference to a proposed increase of rate in another municipality where the latter has consented to the increase and the rights of the complaining municipality are only incidentally involved. This presents the new element of whether a franchise agreement, binding between the parties thereto, is likewise so binding upon another municipality, not a party to the agreement, as to prevent that municipality from entering into a similar contract for the benefit of its inhabitants and involving only rates within its own borders. The Court of Appeals has not laid down any such rule and to so hold seems unreasonable.

The franchise agreement with the village of Mamaroneck was executed in 1899. Prior to the granting of this franchise the Legislature had passed the General Railroad Law of 1890. (Gen. Laws, chap. 39; Laws of 1890, chap. 565.) Section 101 of the law fixed a rate of fare at five cents and further provided: " The Legislature expressly reserves the right to regulate and reduce the rate of fare on any railroad constructed and operated wholly or in part under such chapter [Laws of ·1884, chap. 252] or under the provisions of this article." (Art. 4 [now art. 5] on Street Surface Railroads.) This section 101 of the Railroad Law of 1890 (as amd. by Laws of 1892, chap. 676, and Laws of 1897, chap. 688), re-enacting the foregoing provisions, became section 181 of the revised Railroad Law of 1910 (Consol. Laws, chap. 49; Laws of 1910, chap. 481) with the following added provision: " And the Public Service Commission shall possess the same power, to be exercised as prescribed in the Public Service Commissions Law." By section 49 of the Public Service Commissions Law of 1910 (Consol. Laws, chap. 48; Laws of 1910, chap. 480), which revised section 49 of the former Public Service Commissions Law of 1907 (Laws of 1907, chap. 429), the Commission was given the right to determine just and reasonable rates. Said section 49 has been amended and the short title of the statute changed to Public Service Commission Law. (See Laws of 1911, chap. 546; Laws of 1921, chaps. 134, 335; Laws of 1922, chap. 153; Laws of 1923, chap. 891.) The consent given by the village of Mamaroneck in 1899 involved, by implication of the statute of 1890, the regulatory power of the State to fix the rate whenever the State, acting for itself or through another, should see fit to exercise the right which it had expressly reserved in the General Railroad Law of 1890.

The Public Service Commission has only the powers delegated to it. In the *Quinby* case the Court of Appeals refused to consider the language of the Public Service Commissions Law broad enough to include the power to regulate the rate fixed by the local franchise agreement involved in that case. It is to be remembered, however, that the local franchise agreement involved in the *Quinby* case fixed a rate only within the city of Rochester and in the later cases passed upon by the Court of Appeals the rates involved were purely urban rates confined to the limits of the city granting the consent. The rights of another municipality were not involved. Three judges of the Court of Appeals have already gone on record as holding that consents granted subsequent to 1890 are now subject to the Public Service Commission. (*People ex rel. Garrison* v. *Nixon,* 229 N. Y. 575, 577; *Matter of City of Niagara Falls* v. *Pub. Serv. Comm.,* Id. 333, 341.) A majority of the court have agreed that all franchises granted since the passage of the Public Service Commissions Law in 1907 are subject to the jurisdiction of the Commission. (*People ex rel. Garrison* v. *Nixon, supra.*) In one of the later cases explaining and circumscribing the scope of previous decisions, Judge CARDOZO says: " We have held, in view of the constitutional provisions requiring the consent of municipalities to the construction and operation of railroads in their streets, that the statutes ought not to be interpreted as permitting the Public Service Commission in such circumstances to nullify existing contracts. We are now asked to hold that the municipalities by their contracts may nullify existing statutes. We will not go so far." (*People ex rel. City of New York* v. *Nixon,* 229 N. Y. 356, 362.)

This brings us to the particular case before us. A new situation is presented. The railway company in applying to the Commission in this case does not directly attack the franchise agreement with the village of Mamaroneck but presents a new franchise agreement made with the village of Larchmont, the effect of which, however, is to modify the agreement with the village of Mamaroneck so far as that agreement affects the rights of the village of Larchmont. The modification involved does not change the rates within the village of Mamaroneck but only the rates within the limits of the present consenting municipality. The village of Mamaroneck in 1899 consented upon condition that the company should not charge more than five cents not only within that village but between certain fixed points outside of that village which included the company's lines within the village of Larchmont. The village of Larchmont now finds it necessary to pave one of its streets, a portion of the cost of which must be borne by the railway company. The representatives of that village have satisfied themselves that

justice to the railway company requires them to give financial assistance to the railway company by granting a six-cent fare on one of its lines and a ten-cent fare on another line, such increased fares to be charged only within the limits of that village. On March 26, 1923, the village of Larchmont granted its consent to this increase. The railway company immediately presented the matter to the Public Service Commission by an application to be permitted to put the agreement into effect on short notice as allowed by law. (See Pub. Serv. Comm. Law, § 29, as amd. by Laws of 1921, chap. 134; Id. § 49, subd. 1, as amd. by Laws of 1921, chaps. 134, 335, and Laws of 1922, chap. 153.) The village of Mamaroneck applied for an order of prohibition against the Commission, which was denied. A stay was granted pending appeal from the denial of that motion. Since then the Legislature, by chapter 891 of the Laws of 1923 (amdg. Pub. Serv. Comm. Law, § 49, subd. 1), has repealed so much of the law as had been added in 1921 and under which the Public Service Commission had been given express authority to regulate rates established by such local consents.

Assuming that the jurisdiction of the Public Service Commission over this case must be determined without reference to the amendment of 1921, we still have a situation which seems to be novel. We find a franchise granted by the village of Larchmont in 1923. It is this franchise which is directly involved. The Court of Appeals has said that franchises granted since 1907 are subject to the jurisdiction of the Commission. The consent of the village of Mamaroneck is incidentally involved, however, and that village now claims that the Commission is consequently prohibited from taking jurisdiction. This contention does not seem reasonable. It denies to the village of Larchmont a similar right to administer its own affairs for the benefit of its own inhabitants. It involves the rights of another municipality over which the village of Mamaroneck has no control. The rights of one municipality should not be thus restricted by the agreement of another in the absence of clear authority of law. Under these circumstances the Commission, if denied jurisdiction, must be denied it on the ground that if it exercised its power to determine the reasonableness of the rates fixed by agreement with the village of Larchmont, it may exercise a power not granted to it by modifying *pro tanto* the rate fixed by agreement with the village of Mamaroneck.

There are two objections to conceding such a limitation of the Commission's power. One is that the reasons which actuated the Court of Appeals to say that it would not interpret the statute prior to the 1921 amendment to permit the Public Service Commission to nullify existing contracts, do not apply with the same

force where the court is asked to hold that a municipality by its contract may nullify the right of another municipality to enter into a similar contract for the benefit of its inhabitants. The Court of Appeals has not laid down any such rule and to so hold seems unreasonable. The proposition involves the rights of the public generally as distinguished from those of a particular community and to that extent involves a clear element of distinction. The other reason is that we have no right to assume that the village of Mamaroneck will elect to revoke its consent given to the railway company to operate upon its streets if the Public Service Commission grants an increase of rates within the village of Larchmont. The village of Mamaroneck has provided in its franchise agreement that after thirty days' notice that any condition is being violated, if there shall occur any such violation, the franchise shall cease, determine and be void. Unless it serves the notice, the franchise remains intact. If it serves notice, the railway company has thirty days within which to determine whether it will withdraw its objectionable rates or to make some satisfactory adjustment of the matter. And the Public Service Commission may provide in advance for this situation because it has the right to order the change in rate upon such terms and conditions as it may prescribe. (Pub. Serv. Comm. Law, § 49, subd. 1, as amd. *supra*.) While the Court of Appeals refused in *Public Service Comm.* v. *Westchester Street R. R. Co.* (206 N. Y. 209) to declare that the remedy of the municipality was by forfeiture of the franchise, I think that in a case involving the rights of another municipality, as in this case, the Court of Appeals would hold to the contrary. Why should the village of Mamaroneck by refusing to declare a forfeiture reserved to it in its agreement, stand in the way of the exercise by the village of Larchmont of its proper rights? If the courts are to enforce franchise agreements by prohibition proceedings, or some other high prerogative, why should we not enforce the Larchmont agreement as well as the Mamaroneck agreement? The case of *Public Service Comm.* v. *Westchester Street R. R. Co.* (206 N. Y. 209) has no application here. That case did not involve an application to the Public Service Commission for leave to increase its rate of fare. The company in that case attempted to act without the consent of the Commission and the Commission sought by injunction to restrain the company from thus increasing its fares. In the present case the village of Larchmont wishes to improve its streets. Without an increase in local fares its street railway service may be impoverished or destroyed if the railway company is to pay its share of the street improvement as required by law. (See Railroad Law, § 178, as amd. by Laws of 1912, chap. 368, and Laws of

Matter of Village of Mamaroneck *v*. Pub. Serv. Comm. **345**

App. Div. 330]       Third Department, March, 1924.

1921, chap. 433.)    The alternatives presented seem to be that Larchmont shall go without its street improvements in order that the citizens of Mamaroneck may enforce a right to cheap transportation while traveling in or through Larchmont, or that Larchmont shall have its street improvement at the risk of destroying the street railway which serves both of these villages and other municipalities through which it passes.    Under these circumstances the village of Mamaroneck should be put to its remedy reserved to it in its franchise agreement to revoke its consent, if it wishes cheap transportation or nothing, or to waive its right to revoke, if so advised, after unsuccessful efforts to persuade the Public Service Commission that the proposed rates are unjust and unreasonable.

Therefore, even assuming that this case must be determined with reference to the law as it existed prior to the 1921 amendment, which amendment of 1921 clearly gave to the Commission jurisdiction over rates fixed by local agreements, I think we should hold that the Commission has jurisdiction to consider the proposed Larchmont agreement of 1923 and to make an order thereon subject to such terms and conditions as the Commission may prescribe.

In any event I do not see how we can reverse the order appealed from.    At the time the order was made by Mr. Justice Howard the amendment of 1921 was in force and the Commission clearly had jurisdiction.    Application was made for an order of prohibition against the Commission.    This is clearly a " proceeding " within the meaning of section 94 of the General Construction Law. The statute of 1923, which repealed the provision expressly granting power to the Commission to regulate rates fixed by franchise agreements, did not specially provide by law that it should have retroactive effect so as to cover a pending proceeding.    The repealing act must, therefore, be read in the light of section 94 of the General Construction Law.    We are, therefore, compelled to approve the order of Mr. Justice Howard even though we should say that the Commission is now powerless to act in the premises.    The question of costs is at least involved.    Moreover, it is to be noted that section 94 of the General Construction Law refers to " proceedings."    It does not refer to " special proceedings," which is the term defined in section 46-a of the General Construction Law (as added by Laws of 1920, chap. 917, revising Code Civ. Proc. § 3334), to which Mr. Justice McCann refers.    A " special proceeding," as defined by section 46-a, refers only to a prosecution by a party against another party *in a court of justice*.    The word " proceedings " may be given a broader signification so as to include a statutory proceeding instituted before the Public Service Commission.    While this is not a " special proceeding " because not prosecuted in

a court of justice, it is nevertheless a "proceeding" authorized by statute and in the absence of a definition of the word "proceedings," I see no reason why we should not give to the word its ordinary and usual meaning. I, therefore, favor the affirmance of this order upon the further ground that the order denying prohibition was rightly granted at the time and that the statutory proceeding before the Commission was pending at the time of the passage of the statute of 1923 and was, therefore, unaffected thereby since the statute of 1923 did not otherwise specially provide and must be so interpreted under the provisions of section 94 of the General Construction Law.

Order reversed on the law, with costs, and motion granted, without costs.